UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| IN RE: ) | |
| ) | Case No. 24-13443-JGR |
| HIGH SOCIETY FREERIDE COMPANY, LLC ) | |
| ) | Chapter 11, Subchapter V |
| Debtor. ) | |

## DECLARATION OF PAUL MENTER

I, Paul Menter, the CEO and Managing Member of High Society Freeride company, ("Debtor"), make this Declaration under penalty of perjury pursuant to 28 U.S.C. §1746 as follows:

### Background

1. The Debtor filed its Voluntary Petition pursuant to Chapter 11 of the Bankruptcy Code on June 20, 2024 ("Petition Date"). The Debtor remains a debtor in possession and is in operation of its business pursuant to 11 U.S.C. §§ 1107, and 1108.

2. The Debtor is a Colorado limited liability company with its principal place of business located in Aspen, Colorado. The Debtor is engaged in business owning and operating a retail and online store selling equipment for outdoor adventure activities, including paddle boards, apparel, skis, and snowboards.

3. Effective February 1, 2024 I became the CEO and managing member of the Debtor. Prior to this date I served as High Society Freeride Company's Chief Financial Officer from January 1, 2020 to January 31, 2024.

4. The Debtor has been a successful seller of outdoor activity equipment for 20 years, creating a strong brand built on high quality, lasting products. In 2020, the Debtor's business expanded significantly when individuals looking to enjoy leisure activities began to explore more outdoor activities due to the restrictions resulting from the COVID-19 pandemic.

5. In 2022, the Debtor began to see a downturn in its business operations as the market shifted based on the increase in sales from large online retailers. These changes in market conditions and other external factors contributed to High Society Freeride experiencing significant losses in 2022 and 2023 exceeding $3.3 million. During 2023, the Debtor also had a dispute with one of their primary distributors, resulting in disruptions to its supply chain, and its largest disputed debt.

6. Between 2020 and 2022, Debtor successfully used external lenders, including Wayflyer, WebBank, and 8Fig, to access working capital for business growth in addition to loans and contributions from insiders. In 2023, one of those lenders, 8Fig, defaulted on its contractual agreement to provide $300,000 in funding to High Society intended for product orders. High Society was forced to secure significantly more expensive replacement funding in order to meet its factory obligations. Concurrently, deteriorating marketplace conditions made profitability impossible for High Society in 2023.

7. As a result of these ongoing financial issues, the Debtor again entered into a lending agreement with 8fig Inc. ("8fig") for a merchant cash advance in February of 2024. At the time, the Debtor was promised a loan of over $250,000 to bolster its supply and rejuvenate its sales. Citing slower than anticipated sales, 8fig initially advanced significantly less than the amount promised, despite High Society having disclosed to 8Fig in advance of funding that early 2024 sales would be significantly lower than prior years due to the fact that High Society was sold out of all but one model of inflatable paddleboard. 8Fig continued to make promises of future advances to the Debtor if sales increased, preventing the Debtor from looking for capital from other sources. In December of 2023, the Debtor had also entered into a $305,000 loan agreement with WebBank, to bolster its inventory, but 8Fig's failure to provide its funding as scheduled delayed High Society's ability to fund product orders, further limiting sales and cash flow, and as a consequence of this arbitrary withholding of previously agreed funding on the part of 8Fig, the payment terms for both loans, and slower than planned sales due to a lack of available product for resale driven by 8Fig's withholding of working capital, proved to be burdensome to the Debtor and taxed the Debtor's cash flow to the point were continuing to service the debts and also meet its regular obligations under the normal course of business became impossible.

8. As a result, the Debtor filed its voluntary petition for relief pursuant to Chapter 11, Subchapter V to restructure its debt and continue to operate as a going concern.

## Assets and Secured Creditors

9. The Debtor's primary assets are its inventory and its intellectual property. The Debtor valued its inventory at approximately $274,000 On the Petition Date, and its intellectual property in an unknown amount. The Debtor also had funds in its account in the amount of $21,006 across all accounts, and was awaiting a deposit from Shopify as of the Petition Date.

10. The Debtor is replacing its cash, accounts, and receivables on a daily basis in the ongoing operation of its business.

11. Pre-petition, on or about February 16, 2024, the Debtor entered into document purporting to be a "Master Future Revenue Purchase Agreement" with 8fig for a Merchant Cash Advance Loan in the maximum net distribution amount of up to $265,610. Pursuant to the security agreement in the loan documents, the Debtor granted 8fig a security interest in its assets, including accounts, receivables, and tangible assets.

12. 8fig duly perfected its security interest by filing a UCC-1 Financing Statement with the Colorado Secretary of State on February 16, 2024. According to the Debtor's books and records, 8fig is owed approximately $145,000 as of the Petition Date.

13. In February 2023, in order to maintain cash flow for its operations, the Debtor entered into Merchant Cash Advance Agreements with WebBank. Upon information and belief WebBank has not filed a UCC-1 Financing Statement. The Debtor's books and records reflect that WebBank was owed $263,483 on the Petition Date.

## Use of Cash Collateral

14. The Debtor's revenues and available cash are derived from the operation of the business. The Debtor's revenue is cash collateral, and may be subject to the secured claim of any of the Secured Creditors.

15. In order to maintain operations, ongoing operating expenses such as employee wages, fuel, upkeep, and all of the expense items set forth on the Budget that accompanies the Motion for use of cash collateral must be paid.

16. Therefore, the Debtor's use of cash in which one or more party may assert an interest during the interim period is necessary to avoid immediate and irreparable harm to the estate. Without the use of cash collateral, the Debtor will not be able to pay employees, utilities, or purchase inventory and pay other costs associated with goods sold and services provided.

17. In the event the Debtor is not authorized to use cash collateral, the Debtor will be forced to close and liquidate its assets causing irreparable harm to the estate.

18. The Debtor will be replacing its accounts, cash, and cash equivalents in the course of its daily operations and therefore the collateral base will remain stable and will improve over time. The Debtor's cash position is projected to be positive after meeting expenses during the term of the Chapter 11 case.

**Payment of Pre-Petition Employee Wages**

19. The Debtor currently employs four employees to operate its business. The Debtor pays its employees twice monthly.

20. As of the Petition Date, the Debtor owed approximately $45,570.07 in gross wages earned between January 1, 2024 and the Petition Date, which amount includes the employer payroll tax liability and estimated benefits. The Debtor is seeking authorization to issue payment for the payroll period ending June 15, 2024, totaling $8,333.33, and pending availability of funds, to pay remaining amounts authorized totaling $21,966.67 for a total of $30,300, the maximum amount entitled to priority under 11 U.S.C. § 507(a)(4) of $15,150 for each eligible employee.

21. In the event the employees are not paid on time, they will suffer personal hardships since they generally survive on their wages.

22. If the employees are not timely paid, the employees will seek employment elsewhere. The loss of personnel will prevent the Debtor from being able to maintain its ongoing operations, and the Debtor will be forced to rehire and train new employees, causing the Debtor to lose significant business while new employees are hired and trained.

23. The Debtor cannot afford substantial turnover in its workforce at this critical stage in its reorganization process.

I declare under penalty of perjury that the foregoing Declaration is true and correct.

Dated: June 27, 2024
HIGH SOCIETY FREERIDE COMPANY, LLC

By: ___/s/ Paul Menter_____
Paul Menter, CEO and Managing Member